The next matter on our calendar is Paula Holcomb v. State University of New York at Fredonia. Good morning. I'm Anne Clark. I represent Paula Holcomb. This is a case with numerous pieces of direct evidence of retaliatory motive. The district court disregarded most of this evidence, construed facts against the plaintiff, and misapplied key aspects of the law. The direct evidence ranged from e-mails amongst the decision-makers saying things like, if Ms. Holcomb would just, Professor Holcomb would just stop fighting, she could get her title back, to actually the formal submissions on summary judgment, where statements were made, that the reason she was never reinstated from what was supposed to be a temporary suspension was because she has not settled and has instead pursued this litigation. The district court also made a fundamental error in trying to parse out Ms. Holcomb. When they settled with her, even though she had retained a lawyer and was fighting everything? Well, certainly if they wouldn't make the same proposal, which they did not. I thought they made a similar proposal, but that they couldn't proceed because she had gone ahead and retained an attorney. No, no, the district court, in saying they were offered the same deal, it was an earlier deal that they both rejected because it was reinstating them to roles that were changed and with workloads that were unacceptable to both Professor Holcomb and Professor Rudge, and they both rejected that. It seems to me when I read this case that she would have been, and could have got the same deal that Rudge got, it seems to me. I mean, there's no reason to think that that was not possible, right? It was never proposed to her, and they are saying that they didn't give Rudge his position back because he agreed to drop his grievance. They are saying that the reason they did it is that he agreed to change the way he approached the position and agreed to change sort of the structure of the role, and Professor Rudge vehemently denied that that was any part of him getting his position back. The position that the defendants have taken is that Professor Holcomb, to get her position back, she has to also engage in some sort of discussion about her role and possibly change the role, and they never offered her that position outside of settlement discussions. It wasn't in what Rudge says was accurate in terms of the agreement with Rudge, right? The written agreement with Rudge. There was no requirement there that he modify his position. Is that correct? That is correct, and Professor Rudge also said that he never said he was going to change the way he did things, and there's e-mails suggesting that Professor Rudge continued to engage in conduct that others found annoying thereafter. So, he said he never agreed either in the written... That's my original question. She could have gotten the same deal that Rudge got and been in the same position as Rudge, it seems to me. Well, once she chose to hire an attorney, they did not offer her any opportunity to have that discussion and get her job back, and the position was originally supposed to be a suspension for one school year. They've given many different reasons for what they were doing at the time. They said that they were going to do a study. They said there had to be discussion. They agreed that that stopped. As far as the suspension goes, because that's the other area here, this suspension occurred as a result of the decision that Rudge and your client made as far as the concerto competition was concerned, and in terms of how many winners could play, right? No, Your Honor. That does seem to be a part... That's what the other side is saying, and that seems to be a major factor here, because everything flowed from... There was the April 29th meeting. On May 1, I think it was, they issued their proclamation that the concerto winners, that the fewer winners would be in the concerto, and linked it, linked it to the demands that they had been making all along about more rehearsal time, and then at that point, the competition ceased with, it seemed to me, pretty close to a riot on the part of the faculty members who were counting on these competitions as part of their educational program. There are a number of factual disputes with respect to the causation here. Director Bolter told Professor Holcomb that while he disagreed with the decision, it was her right and Professor Rudge's right to make the decision about the concerto competition winners. Assistant Director Kilpatrick testified that he did not think the concerto competition alone could have been the reason for so drastic an action as demoting Professor Holcomb and Professor Rudge. Much like Feingold, where what the defendants are claiming is an intervening event, we are claiming is the pretext. There's other evidence that they had long linked the concerto competition and the ensemble policy. It wasn't a last minute linking. The pretext was for retaliation against her for refusing his sexual advances. Is that essentially what you're saying? We're saying it's linked. One of the errors that we think the district court made is that she was engaging in two types of protected activities simultaneously, and the district court tried to parse out the union activity from her complaint that she believed that there was a romantic interest in her, and when she rebuffed him, was engaging in hostile and retaliatory conduct. Her initial protests of the sexual harassment hostile environment was through the union. There were back to back meetings, and certainly once she hired my firm, we were protesting retaliation that was based on both types of protected activity. Certainly as a matter of law, that cannot be parsed out when it was so linked. And it's clear that they were angry about both types of protected activity. Director Bolter, for example, suggested the school not expend any money on behalf of one of her initiatives until they see what played out with the legal situation, and specifically mentioned how annoyed he was that she had brought up sexual harassment. What about, this is just a factual question really, and you can help me with. In terms of the union, what was the complaint to the union? What was she raising with the union? She raised with the union two things. Both she and Professor Rudge were raising issues with their workload, credits, where there was an agreement reached in the first meeting that was then reneged. They were raising the ensemble policy, and then in the second meeting, through the union, Professor Holcomb was raising the issue of Director Bolter expressing a retaliatory acts when she rebuffed him. That's an issue she raised with the union back in the fall. Ensemble matter? Are you referring now to the problems with rehearsal, the rehearsal times? First meeting, the one that Professor Rudge also participated in, there was two issues they were raising through the union. One had to do with workload credits. The other was this policy to limit rehearsal time for the ensembles, which they said was related to concerto competition. Thank you. You've reserved a couple of minutes for rebuttal. Good morning, Your Honors. Joseph Spadola for the SUNY Fredonia Defendants. I think it might be at its maximum level. I'll just lift the microphone a little bit. I'd like to first begin with Plaintiff's suspension because there is overwhelming undisputed evidence that Plaintiff and her colleague David Rudge were jointly suspended for engaging in the same joint action which outraged the music faculty. The mere fact that Rudge was suspended on identical terms is conclusive proof that Plaintiff's opposition to sexual harassment and Plaintiff's only response to this argument is to say, well, Plaintiff and Rudge also engaged in joint union activities regarding their workload and the ensemble rehearsal policy. But as we explained in our brief, those union activities are not relevant to the claims before this Court. They're only relevant to Plaintiff's separate state labor law claim, which the district court properly declined to exercise supplemental jurisdiction over. So the Plaintiff can't use her union activity claims to bootstrap her sexual harassment retaliation claim. In addition to Rudge's identical treatment, there is a wealth of evidence showing that this was anything but a pretext. The faculty emails speak for themselves. Contrary to Plaintiff's suggestions, the record contains emails from no fewer than ten professors who expressed extreme disapproval of Plaintiff and Rudge's actions, including the school music director himself, who the day after this action sent an email to the faculty calling their action extremely regrettable and concluding by saying, I will take action, I will handle the consequences of this decision directly with Plaintiff and Rudge. And shortly thereafter, they were suspended. Now, with respect to the continuation of her suspension, I'd first note that this was a side issue. The nature of the suspension, as I understand it, the nature of the suspension wasn't just you did a terrible thing, it was you, we have to look at the authority, your authority to do this kind of thing as an institutional matter. Wasn't that part of the picture? Correct. The faculty members were angry because they felt that the two directors were overstepping their bounds, and this created, this exacerbated tensions that had already existed between Plaintiff and Rudge and the other faculty members. And the suspension was designed to address those tensions. And their reinstatement was conditioned simply on their agreement to participate in a dialogue with the university to work through the tensions that they had Why is it, just as a matter of factual interest, why is it that Dr. Bolter remained involved in the decision-making in connection with this case when he was the subject of a complaint? Well, your honor, he was the director of the School of Music, and in fact, he did recuse himself from a trip to China, and Plaintiff uses that as evidence of retaliatory animus. So the fact, so in one instance where he decided not to travel with the plaintiff to China Why was he involved in other aspects of determining what to do with Ms. Holcomb when the complaint was about him? I'm just interested. Well, the complaint was first made on April 29th, the same day that Plaintiff and Rudge engaged in this misconduct. And the administration didn't see that complaint as related to the consequences of their misconduct. And Bolter, as the music school director, was the person who would handle these kinds of issues. He was the person who had to ensure that Usually in a Title VII sort of internal complaint process, under the Ellerth and Farragher cases, when it's the supervisor, him or herself, who's accused of a form of Title VII violation, then that supervisor is taken out, and there's a separate way to complain, and the supervisor doesn't really have a role in assessing the complaint. Well, to be clear, Your Honor, I may have misunderstood your question. Bolter didn't have any role in assessing the validity of Plaintiff's complaint alleging sexual harassment against him. That was handled by Human Resources Director Michael Daly and John Kaczynski. He wasn't even at the meeting where she made the complaint. That was held... Two separate meetings on the 29th. Correct. One dealing with the union problems and the other dealing with the sexual... That's correct. And Bolter didn't take part in that second meeting. And he wasn't involved in the assessment of her sexual harassment complaints. Well, I guess Ms. Clark points out, and this may be my confusion, that the union activities, which you say rightly really relate to the state law claim, but wrapped up inside the complaint about the union activity is the complaint about sexual harassment. That's correct, Your Honor, but that doesn't advance her cause to distinguish Rudge, because what she's saying is, okay, Rudge got the same treatment, but they were also retaliating against me and Rudge for our union activities. But the union activities that Rudge participated in had nothing to do with the opposition to sexual harassment. So she's making that argument to get around what I think is the fatal flaw in her claim, which is that Rudge got the same treatment for the same action, although he was not involved in any activity protected by Title VII. And the fact that plaintiff's union activity encompassed both sexual harassment and other issues doesn't help her get around that problem. And with respect to the continuation of the suspension, this was one sentence in plaintiff's complaint, which merely noted that the plaintiff had not yet been reinstated at that time. It was given equally short shrift in her summary judgment argument, where she didn't even frame it as an adverse action separate from the initial suspension itself. And yet now it becomes the focus of her appeal argument. And the reason is she recognizes the fatal flaw in her main argument, and this strategic shift is unavailing because the university had an equally valid reason for maintaining her suspension, namely her unwillingness to engage even in a dialogue with the university about the tensions that she had created in the wake of the concerto competition controversy. And Judge Walker is correct that she could have easily gotten the same deal that Rudge had gotten. The university made the same exact offer to them initially that was conditioned not on them changing their behavior, but simply agreeing to participate in a remedial process with the administration to discuss the scope of their roles. Okay, now I understand this position that you're making, but the question that's before us is whether this can be resolved on summary judgment. And that's your adversary saying there are disputed questions of fact all throughout this even in terms of the outrage of the community and whether or not they did the right thing by taking the steps that they took and also whether there was sexual harassment and various other things. That simply this is not capable at this point of being decided on summary judgment. That's I think at least the way your adversary opened. Do you have a response to that? Yes, I think with respect to the suspension itself, the issue before the court is not whether the faculty was justified in being outraged at the plaintiff and Rudge's actions, although I think there's ample evidence to support that. The question is simply whether this outrage was real and was the basis for the suspension. And there's undisputed evidence that it is. Her own witness, Rudge, testified that he understood the reason for the suspension was the concerto competition controversy. That's undisputed evidence. The e-mails from the faculty members are undisputed, expressing extreme outrage. And again, the fact that Rudge got the same treatment is undisputed evidence, conclusively showing that plaintiff's separate sexual harassment claim wasn't the cause of her suspension. There's a difference obviously between, and you pointed this out, between Mr. Rudge and Ms. Holcomb, which is that she had a lawsuit and Mr. Bolter makes this statement that says, well, I don't really see how in connection with possible reinstatement or engaging in this remedial process, I don't see how we can engage in this remedial process while there is this pending suit. There is an e-mail suggesting. What about that statement? Well, first I would say that there's nothing unlawful about the university making a settlement offer to the plaintiff and saying we will reinstate you if you drop your claims and participate in this remedial process. That's what they did with Rudge. That's completely lawful. What the university can't do is say we will have no discussions about your reinstatement unless you drop your claims. And there's no evidence that that was ever communicated to the plaintiff. To the contrary, there's no dispute that lawyers both from the Attorney General's office and SUNY Counsel's office relayed the university's willingness to have this remedial dialogue without her dropping her claims. It was an expressly unconditional offer that didn't fall under the scope of Rule 408. You couldn't really pursue her claims if she was settling the case, could you? I mean, there were two different paths. No, but the university gave her the opportunity to mediate this issue without dropping her case. That was communicated to her. And she denies that administrators made that. Where is that in the record? That is at page 1807 of the record. And I would also, I would compare that against page 1357 of the appendix, which plaintiff cites for the proposition that she was never given any such opportunity. And that page says... What was that page, I'm sorry? 1357. On that page, she said outside of settlement discussions, no administrators have offered a remedial dialogue. But she doesn't deny that lawyers made that offer. And lawyers made that offer outside of settlement discussions. In fact, after... On behalf of the administrators. On behalf of the administrators. Now, to return to Judge Loehr's question, there is evidence that the administrators were confused about whether they could proceed with the reinstatement process while the case was pending in court because they felt that it was being handled by the lawyers. But even if there was any such confusion, it was cured by the lawyers who communicated the university's willingness to have that discussion without her dropping her claims. And finally, I'd point out, the university... There's no evidence that the plaintiff was even willing to participate in a remedial dialogue. Not agree to changes in her behavior. Not admit wrongdoing. But simply engage in a remedial dialogue. When asked at her deposition, would you be willing to have a remedial discussion without dropping your claims, she said, I don't know. That's three years after her suspension. That's insufficient for a jury to conclude that the outcome would have been any different if she hadn't engaged in protective activity. Unless the Court has any further questions, the rest of the audience may leave. Thank you, Your Honors. You've reserved two minutes for rebuttal. Let me start with the last point, which is there was never an unconditional offer conveyed through counsel. In their brief below, on page 23 of their brief, defendants argued that the reason... What's the conditional offer? There was talk about reinstating her as part of settlement discussions. I don't recall all the other parts about it, but it was always in connection with dropping this case. There was never any offer of let's reinstate her or let's have some other discussion, separate from the concept of settling this case. In their own brief, they say that she wasn't reinstated because unlike Dr. Rudd, she wouldn't settle. Seth Gilbertson, the SUNY lawyer, in his affidavit, states that she was unreasonable in her settlement demands, and that is why she was not reinstated. They've tied it directly to settlement. And Dr. Bolter, the director, continued to have numerous discussions about all sorts of other things about the conditions of Dr. Holcomb's employment. There's no reason he could not have discussed the terms or reinstated her. I also want to point out that the law clearly states that there is but for does not mean sole cause. Seeking reinstatement in her claims, part of her claims was to seek reinstatement, wasn't it? Absolutely, and we did clearly below say that part of... Somehow they have to offer, they have to reinstate her in order to, before she drops the lawsuit? I mean, when that's what she's seeking? I'm a little mixed up about that. They have said that she could not be reinstated unless she dropped the lawsuit. This was initially supposed to be a temporary suspension. They also said there was going to be a study. They said there would be a dialogue. They halted all of that as soon as she instituted the lawsuit and did not engage in any of the steps that they said they were going to take initially toward her reinstatement. Dr. Bolter testified everything got frozen when she filed this lawsuit, and their papers make it clear that unless she dropped this lawsuit, she would not be reinstated. It is impermissible because we've cited numerous cases that that sort of linkage is on its face retaliatory. It is clear from the emails and from the statements made that the defendants were very upset about any sort of oppositional activity, particularly if it had a legal or quasi-legal tint to it. That intent can be read by a jury as evidence for their initial decision to suspend her, and that's under the Casolius case we cite in our brief, where somebody got up at a union and said that this person filed charges against us and we're going to fight against them, and that that was evidence not just that the union was discriminating at that point but had been retaliating with earlier actions. She and I understand that this is outside the record and there's some back and forth and footnotes, but she was eventually reinstated, and that was without having to relinquish or end her lawsuit. That is correct. A little over a year ago, shortly after the summary judgment papers were submitted, Dr. Bolter, or actually just before they were, Dr. Bolter was no longer the director. The new director came in and was working toward reinstating Dr. Holcomb, and a little over a year ago she was reinstated, and there was no mediation. There was no discussion. There was no change in her role. I actually have the, it was August 13, 2016. It just states, in consultation with the dean, I'm hereby offering you appointment as director of bands and no other terms and conditions, and that was signed over a year ago. So there was no mediation required. There was no change. What would she have accomplished additionally if there was mediation? We don't know what there would be. I'm just saying that they kept saying that there could be. She got reinstatement, which is what she wanted, correct? Correct, but we're saying before they said she couldn't get reinstated unless there was some process, and then they never offered her the process either through administrators or through counsel. What is the remedy you're seeking now, damages? We're seeking damages. This has been, we have affidavits in the record. This has been very damaging to her reputation that she was. How about payment? Was she suspended without pay? It did not affect her compensation from the school, but it has caused emotional distress, the damage to her reputation, the numerous statements that all the faculty should beware of her, holding meetings behind her back. This is all under Title VII, emotional distress and reputational damage. Correct, Your Honor. Thank you. Thank you both for a reserved decision.